```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3
       UNITED STATES OF MICHIGAN,
 4
                           Plaintiff,
 5     vs.                                Case No. 25-20560
                                          Hon. Terrence G. Berg
 6     D-2 MICHELLE BRANNON,

 7                         Defendant.
       _____/
 8
                        APPEAL OF BOND ORDER HEARING
 9
                  BEFORE THE HONORABLE TERRENCE G. BERG
10                   United States District Chief Judge
                  Theodore Levin United States Courthouse
11                    231 West Lafayette Boulevard
                        Detroit, Michigan  48226
12                    Wednesday, October 1, 2025

13     APPEARANCES:

14     For the Plaintiff        SARAH RESNICK COHEN
       United States of America: ADRIANA DYDELL
15                              U.S. Attorney's Office
                                211 W. Fort Street
16                              Suite 2001
                                Detroit, Michigan 48226
17                              313-226-9637

18                              CHRISTINA RANDALL-JAMES
                                DOJ-Crt
19                              150 M Street NE
                                Washington, DC 20001
20                              202-598-5701

21     Also Present:           JOHN CYNOWA
                                Pretrial Services Officer
22
       For the Defendant       JOHN P. ROGERS
23     D-2 Michelle Brannon:   Rogers Sevastianos & Bante, LLP
                                120 S. Central Ave.
24                              Suite 160
                                Clayton, Missouri 63105
25                              314-354-8484
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

To obtain a certified copy of this transcript, contact:
Linda M. Cavanagh, CSR-0131, CRR, RMR, RDR, CRC
Official Court Reporter
(313) 234-2616 • www.transcriptorders.com

TABLE OF CONTENTS

Page

APPEAL OF BOND ORDER:

Motion by Ms. Resnick Cohen..........................6
Comments by Ms. Dydell.............................23
Response by Mr. Rogers.............................29
Reply by Ms. Resnick Cohen.........................33
Comments/Ruling by the Court.......................40

EXHIBITS

Identification                          Offered      Received

NONE

4

```
 1                    Detroit, Michigan
 2                    Wednesday, October 1, 2025
 3                            —  —  —
 4                    (Proceedings commenced at 1:05 p.m., all parties
 5                    present)
 6                    THE CLERK:  All rise.  The United States District
 7     Court for the Eastern District of Michigan is in session, the
 8     Honorable Terrence G. Berg is presiding.  You may be seated.
 9                    Court calls Case No. 25-20560, the United States of
10     America versus Michelle Brennan.
11                    Counsel, please state your appearances for the
12     record.
13                    MS. RESNICK COHEN:  Good afternoon, Your Honor.
14     Sarah Cohen on behalf of the United States.
15                    THE COURT:  Ms. Cohen.
16                    MR. ROGERS:  Good afternoon, Your Honor.  I'm John
17     Rogers on behalf of Michelle Brannon.
18                    THE COURT:  And good afternoon, Mr. Rogers.  Good
19     afternoon, Ms. Brannon.
20                    MS. RESNICK COHEN:  If I may, Your Honor, I have two
21     co-counsel with me, if they may enter their appearance on the
22     record.
23                    THE COURT:  You may.
24                    MS. RANDALL-JAMES:  Christina Randall-James on behalf
25     of the United States.  I'm with the Human Trafficking
```

1    Prosecution Unit.

2             THE COURT:  And good afternoon to you.

3             MS. DYDELL:  Adriana Dydell on behalf of the United

4    States.

5             THE COURT:  Ms. Dydell.

6             All right.  So we are here for purposes of a hearing

7    on detention in this matter.  The government's moved for

8    detention.  And I know you had a hearing before Judge Grand

9    yesterday, and at that point I think, from what I reviewed, he

10   denied the motion for detention and proposed some bond

11   conditions, and the government wishes to appeal that and that's

12   what we're here for.

13            So this would be a de novo hearing.  In other words,

14   the Court needs to look at it independently and make a

15   determination as to whether or not there are any conditions or

16   combinations of conditions that would be sufficient to protect

17   the community and prevent the defendant from fleeing.

18            And so I wanted you to know that I've reviewed the

19   materials that were filed in the case by the government and by

20   the defense.  I've also tried to listen to as much as I could

21   of the hearing.  There hasn't been as much time because of us

22   being involved in other hearings and because it was quite

23   lengthy, but I listened to about half of the hearing that you

24   had before Judge Grand so I'm somewhat familiar with what was

25   presented there by both sides.

1          But I do want to give you the opportunity now to

2     present whatever information you wish to present, and so

3     because it's the government's motion, Ms. Cohen, you may

4     address the Court.

5          MS. RESNICK COHEN:  Thank you, Your Honor.

6          As the Court is well aware, Your Honor, both by the

7     briefings and by the argument that you heard yesterday,

8     Michelle Brannon, Defendant No. 2, was the enforcer and the

9     onsite leader of this organization in multiple locations across

10    the country since 2013.

11         The bond conditions imposed by the magistrate judge

12    will allow this onsite, hands-on enforcer of David Taylor's

13    terrifying criminal organization to maintain contact with

14    individuals who have been involved with imposing punishments on

15    victims.  Specifically, under the bond conditions imposed, this

16    leader will be allowed contact with Ms. Kearisten Jones and

17    with Mr. Joseph Bush.

18         THE COURT:  So I understand that concern and I saw

19    that in the bond conditions, and I guess what I'm not entirely

20    sure I did understand is why is it necessary for Ms. Brannon to

21    main con -- maintain contact with those individuals?

22         MS. RESNICK COHEN:  There isn't a legitimate reason

23    why she needs contact with those individuals, Your Honor, not

24    only --

25         THE COURT:  Okay.  So following up on that, if she

1    did not, if they were included within the condition of having

2    no contact with folks who were part of this organization, would

3    that be sufficient do you think to protect the community then?

4         MS. RESNICK COHEN:  No, Your Honor.  That is our

5    argument in our brief and both before the magistrate judge,

6    that of course any condition of bond would be that she not have

7    contact with any victims, witnesses or members of the

8    organization, but it is the government's position that that is

9    an impossible condition for Michelle Brannon to abide by.  So

10   in essence, the government is arguing to the Court that

11   Michelle Brannon will likely violate that condition of bond

12   very soon after release.

13        The government's argument is that since 2013,

14   Michelle Brannon has known no other life other than leading

15   JMMI and KOGGC.  She -- as the government has argued, she is --

16   has been the enforcer of this organization.  Let me be clear

17   that the nature of this organization was such that Defendant

18   No. 1, David Taylor, lived apart from the victims and the

19   workers, and that began during the pandemic.  He removed

20   himself from onsite enforcement.  He put Michelle Brannon,

21   Defendant No. 2, in charge of onsite enforcement in every

22   single call center.  She was either present in Missouri or

23   Florida or the former hotel with the fence and the armed guard

24   in Houston, Texas, and David Taylor entrusted her to carry --

25   not only carry out every rule, every punishment, every

 1    rebuking, but he also entrusted her with all of the financial

 2    decisions of the organization.  She's the signatory on multiple

 3    accounts.  She was aware on a minute-by-minute daily and weekly

 4    and monthly basis of all of the financial decisions of the

 5    organization.  She knows nothing else.

 6            She has, to the government's knowledge, no other

 7    friends outside the organization.  She has no means to provide

 8    herself with living expenses.  And a very appropriate example

 9    of how bond would be inappropriate in this case and how she

10    wouldn't be able to abide by it is the bond address proposed by

11    the defense and -- and listed as a condition by the magistrate

12    judge is a house that is leased by the organization and

13    presumably paid for by the organization.  So how does --

14            THE COURT:  Which house is that?

15            MS. RESNICK COHEN:  That is the house in Northville

16    that is proposed as the bond address.  The magistrate judge

17    chose that location versus her returning to the call center

18    location in Florida.  But as the government argued yesterday,

19    the house in Northville is leased by the organization, so how

20    is it that Michelle Brannon, who has no employment and no funds

21    of her own -- although Adriana Dydell will, if you need, submit

22    to the Court the assets that she does have access to, but

23    again, those are illegitimate assets.  What legitimate assets

24    does she have to pay for the monthly rent on that leased

25    location, the utilities, food, just daily living expenses?  She

```
 1    has no way to support herself other than the individuals in the
 2    organization.
 3           So she would, at a minimum, at a minimum, Your Honor,
 4    have contact with those individuals to survive on a daily basis
 5    in a home located in the Eastern District, which, by the way,
 6    we argued to the judge yesterday she has no ties to this
 7    community whatsoever except for the criminal activity that was
 8    occurring on -- at the Taylor, Michigan location, which was for
 9    a long time the headquarters of the organization at its
10    inception and remains the lead place of the -- of the
11    broadcasts, which, as we argued to the magistrate judge
12    yesterday as well, those broadcasts are occurring, they are
13    ongoing.  The organization is still soliciting donations from
14    callers who are unaware or were not told of the criminal nature
15    of the organization.  And it is reasonable to assume that the
16    money raised by the donors who are unaware that they are giving
17    to a criminal organization will be used to support Defendant
18    No. 2, Michelle Brannon.
19           More importantly, Your Honor, the victims of this
20    organization and the witnesses to this criminal organization
21    are located throughout the country.  There are some in the
22    Eastern District of Michigan.  There are some in other places
23    across the country by virtue of the nature of the criminal
24    organization.  As detailed in the government's brief, search
25    warrants were executed in locations across the country — here
```

1   in Michigan, in St. Louis, in North Carolina, in Florida and in

2   Houston.

3       So due to the nature of this trafficking

4   organization, victims of forced labor, just like victims of

5   trafficking organizations generally, have experienced profound

6   physical and psychological trauma.  Some are ready to come

7   forward soon after they escape or extricate themselves from the

8   trafficking situation.  Others need time to feel safe and

9   secure to come forward and tell their stories, to tell their

10   stories of forced labor, of physical abuse, of psychological

11   abuse, of sleep deprivation, of food deprivation, of denial of

12   medical care.

13       And if Michelle Brannon is released into the

14   community, the word will spread like wildfire.  Her associates,

15   including some of those in the courtroom, are very active in

16   social media.  It will be projected across the country that

17   Michelle Brannon has been released into the community, and

18   those people that she victimized will be extremely fearful of

19   coming forward and telling their stories.

20       And as explained by the government during the course

21   of the detention hearing yesterday, one of the -- one of the

22   individuals who has maintained a integral role of the -- in the

23   organization, Mr. Joseph Bush, was located in Tampa on the date

24   of the execution of the search warrant; that was August 27th.

25       In order to attempt to provide services to the

1   victims in the Tampa location, the government set up a

2   secondary location to offer the victims essential services:

3   food, their own phone because their phones are taken away, to

4   assess their medical needs because they were deprived of

5   adequate medical care.  Many of them told the victim services

6   personnel, not just the government but the victim services

7   personnel present, that they wished and they asked for

8   assistance from victim services.  They wanted to be helped and

9   they wanted to be removed from the situation.

10          Instead of receiving that help, Joseph Bush came to

11  the secondary location, he spoke to many of those individuals

12  asking for assistance, and he convinced those individuals to

13  leave the secondary location, so they were deprived of the

14  assistance that they had asked for.

15          So the government submits that Joseph Bush, who has

16  declared himself as number three in the organization and who

17  under the magistrate judge's orders will be allowed contact

18  with Brannon, will continue to reach out to potential

19  witnesses.  He will reach out to victims in order to protect

20  Michelle Brannon, to protect David Taylor, and to essentially

21  obstruct the orderly administration of justice.

22          I'm pointing out Mr. Joe Bush in particular because

23  of that incident in Tampa, but it is the government's position

24  that those who are now carrying on the criminal activity of the

25  organization or at least failing to cease the criminal activity

1    of the organization will with Michelle Brannon because they

2    have been associates for such a long time, they together will

3    continue to jointly interfere with the recovery of victims and

4    witnesses who need to feel safe and to feel secure and to heal.

5          I do want to emphasize as well, Your Honor, some

6    other troubling aspects that you may have heard during the

7    course of the hearing yesterday or may not have.  So if I may

8    just take a moment to put on the record some additional

9    information about individuals who are in the courtroom and that

10   Michelle Brannon has relied upon and that David Taylor has

11   relied upon to carry out not just the criminal activity of the

12   organization, but more importantly the punishments of the

13   organization which traumatized a number of individuals.

14         For example, David Taylor texted to a victim of the

15   organization, who will remain unidentified at this time in a

16   public forum, "Michelle and Kea," referring to Kearisten Jones,

17   "Make them all stand and tell them if the punishment of 4am

18   don't work I'm going to make it worser and worser .. They are

19   going to get their beds out of my house and sleep in the

20   garage!!  Everyone piled in there!!  This ruthless bootcamp is

21   going to guess worse and worse .. until they do what we are

22   telling them .. their [sic] will only be soup, bread and water

23   for all of the degenerates every day .. nothing else .."

24         Again, Your Honor, that is David Taylor ordering

25   Michelle Brannon and Kea Jones, an individual that the

1  magistrate judge is allowing Michelle Brannon to have contact

2  with while she's out on bond.  There's no question that contact

3  with anyone who remains a part of this organization, any

4  witness to this organization or any victim in this

5  organization, does not keep our -- both the Eastern District of

6  Michigan community safe for those victims who reside here and

7  also the victims who reside across the country.

8          And again I can't emphasize the point enough that

9  this organization has credibly active social media presence,

10 particularly on Facebook.  They have a YouTube channel and they

11 have broadcasts that remain on Sundays, but also basic

12 donations 24-7 literally.  That was the nature of the

13 organization.  It was forced labor.  The workers were forced to

14 call and ask for donations all day long and all night long.

15         So the point of this, Your Honor, is that when

16 Michelle -- if Michelle Brannon were to be released into that

17 community, into the community, the news would spread like

18 wildfire.  This isn't a situation where she could quietly live

19 isolated and the victims could take the time they needed to

20 recover from their trauma and come forward and keep the

21 community safe.  Instead, they will be terrified.

22         Victims who have come forward have explained to the

23 government that, again, Michelle Brannon was the lead enforcer.

24 She was the face that they saw every single day.  She was the

25 person who actually carried out the punishments either ordered

1    by David Taylor or ordered by her.  So although David Taylor

2    was the original creator of the organization, Michelle Brannon

3    was really his lieutenant general.  She was the person who was

4    in charge on a daily basis of carrying out the general's

5    orders.

6              THE COURT:  How do you actually, if you can give me

7    some kind of example, foresee some type of witness intimidation

8    or victim intimidation being conducted by the defendant if

9    there's a condition that requires no such contact and there's

10   also a computer and cell phone monitoring condition that would

11   enable the Pretrial Services to know about whatever contacts

12   the defendant had, how -- how do you foresee that type of

13   danger occurring?

14             MS. RESNICK COHEN:  In several ways, Your Honor.  The

15   government's first concern is a serious one, and that is,

16   without getting into specific details, the government is aware

17   that the computer monitoring by Pretrial Service is not the

18   same kind of monitoring that would be engaged in by the

19   government.  It's probably best that I not highlight any

20   further details in that regard.

21             THE COURT:  What makes -- do you have a reason to

22   believe it would be ineffective?

23             MS. RESNICK COHEN:  Yes.

24             THE COURT:  Why.

25             MS. RESNICK COHEN:  The -- the witnesses and the

1    victims and the government agents in this case understand the

2    connections of the leadership of this organization in a way

3    that a Pretrial Services officer would not understand and

4    things that are significant to the government.  For example, we

5    explained to the magistrate judge that it is impossible to

6    provide to the Court or to Pretrial Services a full list of

7    former workers, witnesses, victims that the defendant should

8    have no contact with.  Due to the nature of the scheme, due to

9    its length, its breadth and the closed-off nature of it, it is

10   impossible to give Pretrial Services a list of individuals that

11   the defendant should have no contact with.

12         And if you need any further explanation of that, I'm

13   happy to provide it.  But this isn't a situation where there's

14   a singular victim or three victims or four victims where it

15   would be simple to say to Pretrial Services, "Please let us

16   know if she has any contact via computer or otherwise with

17   these individuals.  That would be a violation of her bond."

18         So the nature of the organization has been --

19         THE COURT:  Government could provide some such names,

20   could you not?

21         MS. RESNICK COHEN:  I'm sorry, I didn't hear the

22   question.

23         THE COURT:  You could provide some such names.

24   You're saying you might not be able to provide all the

25   potential victim names, but...

1            MS. RESNICK COHEN:  It -- it -- it's literally

2    impossible, Your Honor, because, again, I want -- I want to

3    emphasize the nature of the closed-off criminal activity, and

4    let me explain what I mean.  This organization has been in

5    existence far before Michelle Brannon joined it, but let's

6    limit the discussion to the time when she joined it.  She

7    joined in 2013.  The victims and workers of the organization

8    join.  Their phones are taken away.  They are completely cut

9    off from their family, their friends and the outside world.

10   They remain in the organization with no contact to the outside

11   world.  They're deprived of sleep, deprived of food, deprived

12   of medical care.  They cannot run to a neighbor's and say "I'm

13   a victim of forced labor, please help me."  And once they

14   leave, they're terrified of reporting what has happened to them

15   because of the psychological torture engaged in by David Taylor

16   and Michelle Brannon.  So there are victims and witnesses out

17   there who are still terrified to come forward.

18            So the government is well aware of many victims, many

19   witnesses of course.  As evidenced by the indictment, the

20   government has charged substantive counts regarding eight

21   victims of forced labor, but there are many, many more

22   additional victims and witnesses whose names are yet

23   unidentified because they're terrified to come forward, and

24   they're terrified to tell their stories regarding their

25   physical, emotional and psychological trauma caused by David

1   Taylor and Michelle Brannon.

2          So this -- this isn't a simple -- no case is -- is

3   simple, but this case is extraordinarily complicated given the

4   nature of the victimization, Your Honor.  And so the

5   government's point is that it is -- it literally is impossible

6   to provide a list to the Court or on a bond document or to

7   Pretrial Services regarding which individuals the defendant

8   shall not have contact with.

9          And coupled with that impossibility is the fact that

10  Michelle Brannon has no legitimate friends or associates that

11  she can rely upon.  She has no employment.  She has no ongoing

12  family ties.  Her -- her family and her friends are this

13  organization.  That is all she's known for 20 -- for -- since

14  2013 is when the government submits she's been Defendant No. 2

15  or the lead co-conspirator with David Taylor, but she's been in

16  the organization for many more years.

17          THE COURT:  Well, I'm trying to stick with what we

18  need to do regarding the factors under the Bail Reform Act and

19  3142(g) and the question whether there are any conditions or

20  combinations of conditions that'll protect the community.

21          And so I understand what you're saying and that is

22  that the conduct has been ongoing for some time and also that

23  the defendant's connections are primarily to this group rather

24  than to any outside support, and I think that's something to

25  consider.

1              But I'm not convinced at this point from what you're

2     saying that the conditions that are proposed would not

3     adequately protect the community.  That's what I'm trying to

4     deal with here.  I get what your point is regarding the

5     individuals who are still part of the organization.  You've

6     alleged in your indictment and in the hearing evidence was

7     proffered that this was a corrupt organization, is a corrupt

8     organization that's -- has been engaged in this forced labor,

9     and that presents a danger.

10             That is not going to continue with this defendant

11    anymore.  She's -- she's arrested.  She's not going to be

12    allowed to have any contact with that organization anymore.

13    And so the danger that she was causing was through that

14    organization as I see it, and that's why I'm trying to focus on

15    what danger she could pose even if she's not in the

16    organization anymore.

17             MS. RESNICK COHEN:  Your Honor, the government is in

18    possession of information that the organization continues to

19    require individuals to work very long hours in order to raise

20    money for this organization on an ongoing basis.  I'm not at

21    liberty to say how the government obtained that information.

22             THE COURT:  Well, where are they working?  Didn't you

23    raid all their places?  I thought they were like put out of

24    business to some degree.

25             MS. RESNICK COHEN:  That is -- that is unfortunately

1    not the case, Your Honor.  The individuals that the magistrate

2    judge allowed to have contact with Ms. Brannon continue to run

3    the organization.  They continue to solicit donations and they

4    continue to receive instructions from individuals, and I would

5    prefer to leave it at that.  They -- they receive instructions

6    from individuals as to how to continue.

7            THE COURT:  Okay.  I understand.  But those -- those

8    individuals and their ability to stay in touch with Ms. Brannon

9    is to me, as I hear you, that's an objection to the bond

10   conditions that were proposed.  You have an objection because

11   you believe these people are inappropriate to be having

12   continued contact with her, and that may well be a valid

13   objection, especially based on what you have said, but that is

14   a separate question from whether or not there are conditions

15   that will protect the community from the defendant's conduct.

16           MS. RESNICK COHEN:  I understand, Your Honor.  So let

17   me -- let me back up a moment and explain the law that applies

18   to this case.  As we described in our brief and both before the

19   magistrate judge, this is -- there is a presumption of

20   detention in this case, which is exceedingly important to be

21   reminded of.  Congress, in deciding which cases to apply -- to

22   apply presumption of detention to, specifically identified

23   forced labor as one of those cases because Congress understood

24   that these defendants are particularly dangerous.  They're

25   dangerous during the course of the criminal activity and

1    they're danger -- they are a danger when released.

2           So it's under the Bail Reform Act that the

3    presumption applies, and again, that is because the nature of

4    the manipulation and the exploitation that occurs during the

5    course of forced labor.  This district does not see forced

6    labor cases very often and that is because they are difficult

7    to uncover, but the government was able to do so in this case.

8           So the point is Congress identified these -- these

9    leaders of forced labor organizations as particularly dangerous

10   individuals, again, not just during the course of the criminal

11   activity but upon their release, and that is why there is a

12   presumption of detention that applies.

13          THE COURT:  So the presumption that applies, is that

14   not similar to the presumption that applies to certain drug

15   cases, for example?

16          MS. RESNICK COHEN:  Yes, Your Honor.

17          THE COURT:  Okay.  So it's a presumption, and courts

18   are quite familiar with how to deal with a presumption.  And

19   nonetheless, even in presumption cases, sometimes there are

20   still conditions that can adequately protect the community, and

21   in that sense the presumption is overcome.

22          And so I understand that there's a presumption.  I --

23   I read that.  I didn't see that being disputed.  And there's a

24   presumption.  And so -- but the presumption alone does not

25   necessarily require detention.  You have to look at all the

Appeal of Bond Order Hearing • Wednesday, October 1, 2025

1   evidence.  That's part of the evidence and I'm certainly

2   weighing that and considering that and it is important.

3           But I think what we need to deal with here is the

4   question of, even assuming there's a presumption, what dangers

5   cannot be adequately dealt with by strict conditions?  Because

6   we have either full detention or we have strict conditions, and

7   why is it necessary to have full detention to protect the

8   community as opposed to strict conditions?  That's -- that's

9   what I think needs to be decided.

10          MS. RESNICK COHEN:  So as the government stated, Your

11  Honor, the danger to the community is due to, among other

12  things, Michelle Brannon's literally sadistic and serial

13  physical and psychological ability to manipulate individuals

14  who are terrified of her throughout the country, and she will

15  find a way to reach those people, she will.

16          THE COURT:  Well, if she did, that would be a

17  violation and she would find herself detained.  As soon as --

18          MS. RESNICK COHEN:  So --

19          THE COURT:  -- as soon as something like that

20  happened, that would be the end of her bond, and that's --

21  that's I think the -- the question.  I -- I hear what you're

22  saying, and there are allegations in the indictment that

23  suggest her involvement in manipulating and pressuring others.

24  Those are specific allegations which I read in the indictment.

25  But of course the indictment is a charge and needs to be proven

1    beyond a reasonable doubt, and so it's part of what the Court

2    has to take into account.

3            MS. RESNICK COHEN:  Understood, Your Honor.

4            And there is also the issue of risk of flight.  The

5    Court must consider whether she's a danger to the community or

6    a risk of flight.

7            THE COURT:  Yes.

8            MS. RESNICK COHEN:  So if the Court is not convinced

9    that she's a danger to the community, which, of course, the

10   government submits that she is a danger both to the Eastern

11   District of Michigan community and the community across the

12   country, she is also a risk of flight.

13           Adriana Dydell is here to discuss in more detail her

14   access to financial assets that would allow her to flee the

15   prosecution.

16           But it also is important to note for the record the

17   penalties that are involved in this case which is a factor that

18   this Court must consider.  And because we briefed all of the

19   factors, I haven't gone through each one individually, but the

20   risk of flight is significant in this case, Your Honor.  Each

21   offense, as detailed in the brief, carries a statutory maximum

22   penalty of 20 years in prison, and again, that reflects the

23   serious nature of these crimes and the serious often physical

24   but equally important psychological nature of forced labor.

25           And according to the government's initial

1    calculations of just the forced labor offenses, as detailed in

2    our brief, the -- as of today's date, the base offense level

3    just for the forced labor alone, Your Honor, is 34.  The

4    corresponding sentencing range is 151 to 188 months in prison.

5    There's an additional serious base offense level for the money

6    laundering conspiracy, which is also 34.

7            So based upon the base offense level calculated as of

8    today's date again, enhancements can change depending on what

9    occurs between now and the time of trial or a plea of guilty,

10   but the point here is that the Court should recognize the

11   incentive that Michelle Brannon has to flee based upon the

12   seriousness of the sentences that would likely be imposed in

13   this case.

14           We highlighted in our brief some of the assets that

15   she has, but again, the chief of our Money Laundering and Asset

16   Forfeiture Unit is here to describe in more detail her access

17   to assets, and if the Court were to allow, I would ask Adriana

18   Dydell to have a few moments to describe her access to assets.

19           THE COURT:  All right.  Why don't we do that because

20   you do bear the burden and you wish to present that so you may

21   do so.

22           MS. RESNICK COHEN:  Thank you.

23           MS. DYDELL:  Thank you, Your Honor.

24           The magistrate has proposed to place the defendant in

25   the custody of individuals who are still integrally involved

1    with KOGGC.  These individuals have direct contact with the

2    remaining members of the organization.

3            THE COURT:  Who are you referring to?

4            MS. DYDELL:  Mr. Joseph Bush and Mrs. Kea Jones.

5            Mr. Joseph Bush also has direct access to all of the

6    accounts associated with the organization.  The government did

7    seize funds from those accounts on August 27th.  However, those

8    funds have since been transmitted to the United States Marshal

9    Service and the accounts themselves remain open.

10           As was discussed at the detention hearing yesterday,

11   the organization is continuing to solicit donations from

12   individuals, specifically asking for donations in the form of

13   PayPal and Cash App.  The defendant has access to these

14   platforms, as was discussed in the government's brief.  And if

15   we look at the amount of funds that the organization has

16   generated with platforms like this, just looking at the year

17   2024, it was close to a million dollars on these platforms

18   alone, not considering other forms of donation which are also

19   taken by the organization.

20           THE COURT:  Are you saying that this defendant, Ms.

21   Brannon, has access to millions of dollars on these cash apps?

22           MS. DYDELL:  Ms. Brannon has access to Cash App and

23   PayPal.  She has accounts with those companies.  Mr. Joseph

24   Bush also has Block accounts.  Block is the organization or the

25   company that controls payments for Cash App and Square.

1          So my position, the government's position is that

2    defendant has easy access to many sources of funding,

3    particularly if she is allowed to remain in contact with

4    members of the organization.

5          Mr. Bush is on -- as I said, he is an authorized

6    signer on the organization's bank accounts.  He holds title to

7    several vehicles that are -- that were acquired by the

8    organization with criminal proceeds.  And he has, over the

9    course of his involvement in the organization, has been the

10   authorized signer on at least 11 other bank accounts that the

11   organization has closed.  The organization has a history of

12   opening and closing bank accounts, and with the seizures,

13   although I have mentioned that accounts remain open, additional

14   accounts could be opened, and -- and it is likely that

15   individuals in high positions of authority in the organization

16   like Mr. Bush would have access to those accounts and to those

17   funds.

18         The organization also used many non-traditional forms

19   of maintaining their assets, and as the government's brief

20   described, many of these other forms of assets that were

21   acquired by the organization were -- were in the custody and

22   control of -- of the defendant herself in her room at the

23   mansion in Florida.

24         THE COURT:  What was there?  What are you saying was

25   there?

1          MS. DYDELL:  So if you turn to the government's brief

2     on pages 19 and 20, there was an estimated $500,000 in gold

3     bars in a locked safe in a closet in --

4          THE COURT:  Those have been seized, correct?

5          MS. DYDELL:  They -- correct.  However, the

6     organization has other locations where assets may be located,

7     and I'd like to -- to leave it there for now, but the

8     government is aware that there may be additional locations

9     where additional assets are located.

10          As one of the signers on the bank accounts — and I

11     should say both Michelle Brannon and Mr. Bush were signers on

12     the bank accounts of the organization — they controlled the

13     funds of the organization and they likely know where the

14     additional assets are.

15          In addition, I mentioned yesterday at the hearing

16     that there is Bitcoin.  The organization has solicited

17     donations on this platform as well.  And as of yesterday, these

18     funds were still available on the blockchain.  The government

19     has not been able to locate those funds, the -- the -- the

20     wallet itself.

21          THE COURT:  You have not been able to locate what

22     funds, the Bitcoin funds?

23          MS. DYDELL:  The Bitcoin funds, yes.  They are --

24     they are located in an -- in a -- what we call a hard wallet or

25     an offline wallet.

Appeal of Bond Order Hearing • Wednesday, October 1, 2025

27

```
1              THE COURT:  How do you know they exist if you
2     haven't --
3              MS. DYDELL:  Because the -- the blockchain shows that
4     they still exist.  The blockchain maintains the information.
5              THE COURT:  How much funds is it?
6              MS. DYDELL:  It's approximately $35,000.
7              THE COURT:  I thought Bitcoin was worth a lot more
8     than that.
9              MS. DYDELL:  The value fluctuates so tomorrow it
10    could be worth a lot more than that.
11             THE COURT:  Okay.  So I'll ask you a question similar
12    to what I was asking Ms. Cohen, which is if the conditions were
13    to say, for example, that — and I think they do — that Ms.
14    Brannon is not permitted to have any association with the
15    organization, and that that would include getting access to
16    funds that are the association's funds and the accounts that
17    are part of the association or the organization, why would that
18    not adequately address the concern of her having access to
19    these funds?
20             MS. DYDELL:  Your Honor, Ms. Brannon has no
21    independent funds of her own that we are aware of.
22             THE COURT:  Well, that's going to be her problem
23    then, isn't it?  I mean we don't -- we don't detain people
24    simply because they're poor or homeless.  She -- she can't be
25    associated with this organization anymore.  That's part of her
```

 1    conditions.

 2         MS. DYDELL:  And -- and as my colleague has argued,

 3    it is the government's position that based on the extended

 4    period of time that she has been involved in this organization,

 5    it is impossible for her to extricate herself from the

 6    organization.

 7         THE COURT:  She's going to have to try.  Okay.

 8    Anything else?

 9         MS. DYDELL:  The only other thing I would point out

10    is that the organization has a history of transmitting funds by

11    wire to various individuals, and one of the individuals that

12    was proposed as someone that she could -- Ms. Brannon could

13    have contact with, Ms. Kea Jones, did receive a significant sum

14    of money in this way from the organization.  She received a

15    wire of approximately 127,000 from one of the bank accounts

16    that was ultimately seized.  So again --

17         THE COURT:  Ms. Jones received that you're saying?

18         MS. DYDELL:  Correct, yes.

19         THE COURT:  Okay.  Thank you very much.

20         All right.  Well, let's hear from the other side here

21    on this.

22         MS. DYDELL:  Thank you, Your Honor.

23         THE COURT:  Thank you very much, Ms. Dydell.

24         MR. ROGERS:  Good afternoon, Your Honor.

25         THE COURT:  Good afternoon, sir.

```
 1          MR. ROGERS:  Appreciate the Court taking this matter
 2   up so quickly.  I'm certainly respectful of your time and don't
 3   wish to necessarily hear myself talk when the Court has
 4   indicated that it has some concerns regarding conditions of
 5   bond but not necessarily bond itself.
 6          I'm certainly prepared -- I thought yesterday on the
 7   record perhaps Judge Grand made a very lengthy legal conclusion
 8   with respect to the Bail Reform Act that I don't believe that I
 9   need to lecture you on.  The Court seems more than well versed
10   in the Bail Reform Act and how it applied to the evidence that
11   was presented both yesterday and argued today.
12          What I heard is the government's simply speculating
13   and complaining about a number of possibilities that could
14   happen in the future.  From the defense standpoint, we've
15   always suggested both now and -- and yesterday that we have no
16   objection to any of the Court's conditions or any further
17   restrictions to my client's contact with the -- with the
18   church.
19          The individuals that are specifically mentioned as
20   being able to have contact with her, I can talk about them a
21   little bit.  They certainly -- having interviewed them, they
22   disagree with the government's theory of prosecution.
23          Judge Grand certainly understood a number of things
24   yesterday when he came to the conclusion that bond was
25   appropriate.  He appreciated the First Amendment and the right
```

```
1    to freedom of religion.  The Court well knows that the church

2    is not indicted and can function as it wishes to independent of

3    government interference.

4           My client is not either of the individuals that the

5    government is complaining about.  She is Michelle Brannon.  And

6    this particular individual has a myriad -- has no prior

7    criminal arrests, a myriad of physical conditions.  Ms. Kea

8    Jones was proposed by my client and myself as one that should

9    be able to have contact with her because her role in the past

10   has been one of a caretaker.  She transported her to a number

11   of different medical appointments.  My client is being

12   charged -- while she was incarcerated she had a major heart

13   attack, a stent was put in.  She sees a pulmonologist, a

14   cardio -- she's to see a cardiologist and a number -- a number

15   of different doctors.

16          We adhere and defer to -- to you as far as the bond

17   conditions are concerned and whoever you want her to have

18   contact with, knowing that we respect your decision and agree

19   with the conclusion.  The defense doesn't want her to have

20   contact with the -- with the church in order to preserve the

21   integrity of the defense as we intend that this will be a

22   trial.

23          I can tell you that I've -- a number of individuals

24   in this courtroom today who have -- who I can proffer specific

25   information all deny any physical abuse.  The government has
```

```
 1    yet to establish a record that Michelle Brannon invoked any or
 2    participated in physically abusing anyone at any point at any
 3    time.
 4            Instead, they make speculative arguments to this
 5    Court about the possibility of income, the possibility of
 6    future flight risk, the possibility of how it could affect
 7    people that have yet to come forward and are not listed as
 8    victims in this particular case on the indictment.  Well,
 9    they're going to have to come forward at some point.  There is
10    discovery.  They're going to have to be identified so that I
11    can prepare a defense, and they're going to have to come
12    forward before this matter is tried.
13            I can assure you I've been contacted by numbers -- a
14    number of members of the church who dispute each and every
15    allegation of -- of forced work-related conditions.  They
16    dispute the government's theory that people aren't able to
17    freely come and go.  I've spoken with individuals who have left
18    the confines of specific call centers or locations and still
19    participate and consider themself church members.  I've
20    consulted with members who greatly dispute the fact that there
21    is any coercion whatsoever with respect to this organization.
22            THE COURT:  Okay.  That is -- you can leave that for
23    the trial.  In this case we're talking about the indictment,
24    we're talking about identified victims who say they were
25    forced, and so the fact that you may have talked to others I
```

1    see as irrelevant.  Go ahead.

2         MR. ROGERS:  Yes, sir.  With respect to the

3    identified victims, certainly it's a condition, a normal

4    condition that we would adhere to once ordered to have no

5    contact with them whatsoever.  With respect to any other

6    individual you think she should not have contact with that has

7    associations with the church, we'll adhere to that condition as

8    well.

9         But the analysis yesterday was her lack of criminal

10   history alone is -- meets the rebuttable presumption.  And the

11   series of conditions that we went through the defense takes no

12   issue with, and unless you do or would like me to explain why

13   it's -- why it's our position that she shouldn't have contact

14   with other members of the church, we don't take issue with

15   that.

16        THE COURT:  Why is it necessary for her to have

17   contact with these two individuals, Ms. Jones and Mr. Bush?  I

18   don't understand that.  Why is that necessary?

19        MR. ROGERS:  It was a -- it was a -- it was listed as

20   a condition by Pretrial Services because my client shared the

21   need to have Ms. Kea Jones as a person that is well aware of

22   all her physical conditions and could help transport her at

23   times to a variety of different medical appointments.  Her

24   22-year-old son doesn't have a driver's license, and so it's

25   just a practical matter of assistance.  Ms. Jones has said to

 1    me there are a number of times where she's had to pick my

 2    client off the floor who was choking and suffering from what

 3    is -- what were physical deformities and that she's rendered

 4    health care to her personally and physically, and so that's why

 5    I believe Pretrial Services included that as a potential person

 6    that she could have contact with.

 7              THE COURT:  Mm-hmm.  You don't know or do you know,

 8    is Ms. Jones still associated with the organization?

 9              MR. ROGERS:  I believe she is, sir.

10              THE COURT:  Mm-hmm.  All right.  Anything else?

11              MR. ROGERS:  No, sir.

12              THE COURT:  All right.  Thank you.

13              Any rebuttal?

14              MS. RESNICK COHEN:  Yes, Your Honor.  Thank you.

15              First, to begin, Your Honor, there's a significant

16    and substantial complication with a bond condition that

17    includes no contact with members of the organization.

18    Specifically, her son, Joshua Riles, was brought into the

19    organization when he was a minor.  He has spent his life and

20    continues to remain in the organization and he has been a

21    witness to the forced labor alleged by the government.  He

22    lived at one of the kids' homes that was run by David Taylor

23    and Michelle Brannon.  As the government has indicated, the

24    government confirmed that there were minors in the organization

25    during the time that Michelle Brannon was the second in

 1    command.

 2           When the search warrant was executed on August 27th,

 3    he lived in a room with approximately six to eight other men.

 4    He had a gate around his sleeping area because he was required

 5    to take care of the dogs.  He was found in the home with

 6    approximately six devices around his sleeping area, and he

 7    slept on two mattresses on the floor in the home.  To the

 8    government's knowledge, he has no other employment or

 9    connections outside the organization.

10           The government raises this now, Your Honor, because

11    this is Michelle Brannon's son.  If a condition is imposed that

12    she is not permitted to have any contact with any member of the

13    organization, she cannot have any contact with Josh Riles.

14           THE COURT:  Well, that's a condition of the bond

15    that's already been imposed.  That's the condition that

16    currently exists and it's on appeal.  Now, there was a special

17    condition that said that she could have contact with her son

18    and also with Ms. Jones and Mr. Bush, correct?

19           MS. RESNICK COHEN:  That is...

20           THE COURT:  Now, I have special concerns with Ms.

21    Jones and Mr. Bush.  Her son is her son.  I don't think it

22    would be appropriate to say she can't have contact with her

23    son.

24           MS. RESNICK COHEN:  That's why it's complicated, Your

25    Honor, and that's why...

```
1            THE COURT:  It is complicated but...

2            And here's the other thing.  These individuals,

3    whether it's her son or others, are going to have to make a

4    choice between their relationship with her, supporting her, and

5    their relationship with this organization because she is not

6    allowed to have any contact with the organization going

7    forward, any contact whatsoever.  And so if there's somebody

8    that wants to be in her life, they can't be involved in that

9    organization.  That's the way it's going to have to work.

10           MS. RESNICK COHEN:  There is another set of facts

11   that the government needs to alert the Court to.  This was not

12   highlighted in the brief but it is a very significant part of

13   the forced labor and the dangerousness of the forced labor and

14   the nature of the victimization once individuals were able to

15   leave the organization, either because they were kicked out by

16   David Taylor or Michelle Brannon or because they created

17   situations where they could escape.  I will leave it at that.

18   They tracked many victims over social media, particularly

19   Facebook, and they harassed the people that left, and they

20   reminded these individuals of the consequences that would come

21   to them because they left the organization.

22           THE COURT:  Who did that?  Are you saying Ms. Brannon

23   did that, the defendant here?  Who -- who put these Facebook

24   posts out or these different Internet messages you're talking

25   about, who did that?
```

1        MS. RESNICK COHEN:  All of the orders came from David

2   Taylor or Michelle Brannon, Your Honor.

3        THE COURT:  Well, she's not doing that anymore.

4        MS. RESNICK COHEN:  Well, the -- the point is though,

5   Your Honor, Defendant David Taylor and Defendant Michelle

6   Brannon ordered that members of the organization stalk and

7   harass and terrify individuals who were either kicked out or,

8   more significantly, were able to escape.  They were able to

9   create circumstances that allowed them to escape the

10  organization.  And members of the organization, at the

11  direction of David Taylor and Michelle Brannon, stalked them

12  and harassed them over the connections that they did have with

13  them, and I gave Facebook as an example.

14       So these victims that have come forward and

15  additional victims who will come forward even since the

16  execution of the search warrant have informed the government

17  that part of their terror, part of their fear and part of their

18  trauma is not just their experience within the organization,

19  but the stalking and the harassment that occurred for

20  significant periods of time once they left the organization.

21       So again, it is not just what will happen by Michelle

22  Brannon.  It is what her history is of harassing these

23  individuals, and they all know it.  They know what happens when

24  she has the ability to harass and stalk people who have left

25  the organization.

1            So this is her history, this is David Taylor's

2    history, this is Michelle Brannon's history, and this is a

3    history of the people that Michelle Brannon was in charge of.

4    She specifically stated to people, again either through David

5    Taylor or Michelle Brannon, the orders were "go tell so and so

6    who left" -- without getting into specifics 'cuz I'm not going

7    to identify the victims in a public forum -- but to

8    specifically say the consequences that they heard about in the

9    organization if they ever left or defied Michelle Brannon or

10   David Taylor, and they would give examples of tragic accidents

11   or being struck down with -- with terrible diseases.  And

12   again, this is -- this is an indoctrination, Your Honor, over

13   years and years and years of sleep deprivation and food

14   deprivation and physical assaults and threats of violence,

15   which continued once those people left the organization.

16           And that is the key here and that is why the

17   government is so concerned that this organization remains a

18   danger to those individuals who have either left, who managed

19   to escape, or now, because of the execution of search warrants,

20   were able to escape the organization.  They are terrified that

21   this continued harassment and stalking will occur by the

22   organization, again either by David Taylor or Michelle Brannon

23   or those people who have obeyed her for so many years.  Again,

24   this is not an organization that has just like developed within

25   the last six months so it's perhaps easier to extricate

1    yourself from the situation.  This is an organization that has

2    literally been in existence for decades and Michelle Brannon

3    has been in it since 2013.

4           And there are text messages where -- where she

5    specifically says and she -- she -- she criticizes people for

6    emailing her regarding the organization, the money laundering

7    or the forced labor, and she says, "This is discoverable.  You

8    can't -- you can't email me, you've gotta text me, you've gotta

9    text me," thinking that the government will not discover the

10   nature of the forced labor and the money laundering if people

11   are texting her.

12          So the point is, Your Honor, is that it's not just

13   the forced labor that occurred within the organization, but

14   it's the continued harassment and stalking of those

15   individuals.  Why?  Because it was a forced labor and money

16   laundering organization, and the leaders of the organization

17   and those who are vetted in it do not want those people to come

18   forward and talk about their forced labor, to talk about what

19   they witnessed and what they witnessed regarding other people.

20          So it's a sophisticated organization that understands

21   that once an individual is able to escape, they need to do

22   everything possible to keep that person from coming forward and

23   telling what Michelle Brannon and what David Taylor did to them

24   because they -- they -- they are sophisticated enough to know

25   that if individuals come forward and tell their stories, that

1    in addition to the text messages and the -- the evidence that

2    we have on paper, we will have not just the eight victims in

3    the indictment but we will have many more victims who come

4    forward and -- and tell a jury what happened to them.  But they

5    are terrified to do that, Your Honor, if she is in a situation

6    where she or people who are loyal to her and have been loyal --

7    either loyal to her or have been terrified of her and have

8    obeyed her and David Taylor for so many years will stalk them

9    and harass them.

10            It already happened in Tampa on August 27th, and I

11    can provide additional details about that.  Those are people

12    who wanted victim services' help, they wanted to tell their

13    stories, and Joe Bush came to that Tampa location.  It was a

14    hospital, Your Honor.  The government set up a hospital for

15    these people, for the 57 -- approximately 57 people who were

16    located in Tampa.  And there were victim services there, not --

17    not agents there to -- to coerce them to tell their story as

18    alleged by the defense in duty court.  Victim services was

19    there to identify their needs and how we could help them simply

20    lead some kind of normal life going forward.

21            And those who wanted help, instead of getting help

22    from the government, Joe Bush, who admits to be number three in

23    the organization, convinces those individuals -- convinces I

24    use -- I use lightly, Your Honor -- intimidated, obstructed the

25    ability of those people to get needed victim services that they

1    requested on their own, and instead Joe Bush and others in the

2    organization convinced them, coerced them, intimidated them,

3    obstructed the investigation and those people left a hospital.

4           That is the nature of this organization.  This is not

5    a religious organization.  This is a terrifying regime of

6    forced labor and money laundering that benefits no one except

7    Michelle Brannon and David Taylor and those within the

8    organization and no one else.  And so that is -- that is what

9    will happen if Michelle Brannon is out on bond.  These people

10   will remain terrified and intimidated that the same stalking

11   and harassment that they've heard about happening to other

12   people will happen to them, and they will not come forward,

13   they will not heal.  It's not -- and it's not about the

14   government proving its case, Your Honor.  The priority here is

15   the recovery of the physical and psychological trauma of their

16   victims.  That is paramount.

17          THE COURT:  Well, I take that very seriously as well.

18   And I think that if any such conduct were to occur, especially

19   by this defendant, the -- the consequences would be swift and

20   she would be detained because that type of behavior would be a

21   violation.

22          Now, I want to go through what I have to consider

23   under the Bail Reform Act because I have to consider certain

24   factors, and I know that Judge Grand did as well and I know

25   he's very thorough, and I reviewed the -- the record here in

1    terms of the order and I think it was sufficient and adequate.

2         But I have to consider the nature and circumstances

3    of the offense charged, including whether it's a crime of

4    violence.  It is a crime of violence here.  That's part of the

5    reason that it's got a presumption associated with it.  The

6    question is whether or not there's evidence that can meet the

7    presumption and still make it possible for there to be

8    conditions that will adequately protect the community and

9    prevent the defendant from fleeing.  And so in connection with

10   that, I have to consider the weight of the evidence against the

11   person, and that relates to the weight of the evidence as to

12   the danger to the community and the risk of flight.

13        The record, including both what's been presented here

14   and what was before the magistrate judge, does contain some

15   evidence of danger from the operation of this organization.

16   The way the indictment alleges the circumstances, the

17   organization was involved in perpetrating a forced labor

18   relationship between many of its workers in these call centers

19   and the leader, and that's the main defendant, Mr. Taylor, but

20   also Ms. Brannon who was charged as the second in command and,

21   according to the indictment, made many specific manipulative

22   and commanding messages to the -- to the members which did

23   suggest that basically they were in a -- in abusive

24   circumstances, and this is a danger, there's no question about

25   that.  At the same time, however, the danger that we're talking

1    about was taking place within that -- within that organization,

2    and the victims who had to suffer it were members of that

3    particular organization.

4          The question here is whether or not having conditions

5    that would allow Ms. Brannon to be released would present a

6    danger.  And the role that she had in that organization, which

7    did present a danger to others, is over.  She's charged in a

8    criminal -- very serious criminal indictment for her conduct

9    associated with that organization, and she'll have no further

10   contact whatsoever with that organization or its members while

11   she's on bond in this case.  And so the type of danger that she

12   was involved in allegedly during the operation of this will not

13   be able to continue if she complies with her bond conditions.

14         In terms of the history and characteristics of the

15   person, that's another factor that I have to consider, that

16   includes the person's character, their family ties, their

17   employment, their financial resources, their length of

18   residence in the community.  Basically Ms. Brannon has been

19   involved in this organization and that's been her -- that's

20   been her job.  And it doesn't -- that doesn't necessarily

21   reflect well on her to have been, quote, "employed" during this

22   time because the employment that she had was part of an

23   organization that was alleged to be a forced labor operation

24   and about which evidence has been presented and proffered that

25   it was a forced labor operation.

1          But she doesn't have any criminal history.  She

2     hasn't been involved in other criminal activity or charged with

3     other criminal activity that would create concerns and often

4     does create concerns when courts are evaluating whether a

5     person represents a danger to the community.  She was not, as

6     the factor asks, on parole or she was not on probation or other

7     kind of release at the time when she was involved in this

8     activity.

9          In terms of the nature and seriousness of the danger

10    to any person or the community, I've addressed this already.

11    There was a danger to the community from her activity, but that

12    danger was focused inward toward the organization, and her bond

13    conditions will prevent her from being involved in that

14    organization any further.

15         The question here is whether the government can show

16    by clear and convincing evidence that there are no conditions

17    that will adequately protect the community from the danger that

18    Ms. Brannon and her activities presents.  And I've reviewed

19    these conditions and I think the conditions can protect the

20    community because they effectively divorce her 100 percent from

21    the activities of the organization which were dangerous and

22    prevent her from continuing to have any contact with that

23    organization or its members.  And so I think that that

24    condition would be adequate, and I don't think that the

25    government can show by clear and convincing evidence that it

```
 1      would not be adequate to protect the community.

 2              As to risk of flight, again, the only real evidence

 3      of risk of flight that the government points to here is the

 4      significant penalties associated with the offense, and that is

 5      something to consider.  But that's the case in every serious

 6      crime, and usually the significance of those penalties is not

 7      enough on its own to prove a risk of flight.  Her -- her

 8      passport can be surrendered and was surrendered, which will

 9      prevent her from engaging in any kind of travel.  There can be

10      location monitoring, which has been already suggested as one of

11      the conditions, and that would prevent her from going anywhere

12      that was not able to be monitored by the Pretrial Services.

13      And so she's not going anywhere, she's not going to be able to

14      go anywhere, and that condition will be sufficient to protect

15      her from fleeing.

16              I have been conscious of and paying attention to the

17      government's concern regarding any potentially threatening or

18      harassing conduct by the defendant in this case.  I think it's

19      a serious matter, and I think that I'm going to review these

20      conditions regarding that and they perhaps need to be tightened

21      up with respect to making it clear that whether it was

22      something that she herself did or directed anyone else to do or

23      indirectly suggested to anyone else to do, that that would be

24      considered a violation of her conditions if she were to try to

25      harass or send any messages or communications that were
```

 1    intended to in any way intimidate or manipulate individuals who

 2    were associated with this organization.

 3            And so having reviewed all of these different factors

 4    as I must, I think that there are conditions that would be

 5    sufficient to protect the community and also prevent the

 6    defendant from fleeing, and so I am going to impose bond

 7    conditions here and I'm going to affirm the decision of the

 8    magistrate judge which did so.

 9            I want to look at those bond conditions now, and I

10    know we have our Pretrial Services officer present.  I wanted

11    to also indicate that Pretrial Services reports were prepared

12    both by the Middle District of Florida and by the Eastern

13    District of Michigan, which also concluded that there would be

14    sufficient conditions that could be imposed that would

15    adequately protect the community.  I think that those reports

16    were well prepared and thorough, and it appears to me that

17    there are conditions that will adequately protect the

18    community.

19            Now, reviewing the conditions that were proposed by

20    the magistrate judge, it does include, and this is on page 4, a

21    requirement of a computer and Internet monitoring condition,

22    and I think that that's an important condition that I would

23    continue.

24            It also indicates that the defendant is not permitted

25    to have any contact, directly or indirectly, with any person

1   associated with the organization called the Kingdom of God

2   Global Church, or KOGGC, formally known Joshua Media Ministries

3   International, and it had an exception for Ms. Kea Jones and

4   Mr. Joseph Bush.

5        I'm going to amend this condition.  I am not going to

6   allow her to have contact with Ms. Jones or Mr. Bush.  I think

7   sufficient evidence was presented of their continuing

8   involvement in the organization, and in particular by Mr. Bush

9   intimidating witnesses after the search warrant was executed,

10  and Ms. Jones also intimidating witnesses during the course of

11  the allegations that are set out in the indictment, and I think

12  it would be inappropriate for the defendant to continue to

13  associate with them.

14       Mr. Joshua Riles is the son of -- of -- of the

15  defendant and they have a relationship there between mother and

16  child which I am not going to prevent from continuing.

17       As I have said before, however, in my view, whoever

18  wants to associate, continuing to associate with Ms. Brannon

19  needs to sever the relationship with this organization.  And

20  the reason that I say that is because if they don't do that,

21  they're going to run the risk that Ms. Brannon will either

22  intentionally or inadvertently violate her conditions by

23  communicating with individuals in that organization.

24       And so that is the decision of the Court regarding

25  this matter.  I did want to for a moment talk to Mr. Cynowa and

1  ask are there any other conditions that you would recommend

2  that relate to this matter?

3          MR. CYNOWA:  No, not at this time.

4          THE COURT:  All right.  And for the government, are

5  there any other conditions that you would recommend that you

6  think that would be appropriate to further protect the

7  community or prevent the defendant from raising the kinds of

8  potentially intimidating messages or conduct that you raised

9  during your presentation?

10         MS. RESNICK COHEN:  Your Honor, the bond address

11  established by the duty magistrate judge is a house in

12  Northville.  The government raised concerns about that house.

13  I'm just clarifying for the record if that will be the bond

14  address.  And again, that is --

15         THE COURT:  Do you have an alternative bond address

16  that you think that would be better?  There was the other one

17  was in Tampa?  That was the -- that was the call center itself,

18  so that doesn't seem appropriate at all.

19         MS. RESNICK COHEN:  That's correct, Your Honor.  So

20  the government's position is that there is no appropriate bond

21  address, period.

22         THE COURT:  I know.  I know you said that and I -- I

23  understand that concern.  I will say if this bond address is in

24  some way being funded by this organization, based on these bond

25  conditions, Ms. Brannon can have nothing to do with how this is

```
 1    being paid for because that's -- that's associating with the
 2    church.
 3              Did you wish to address that, Mr. Rogers?
 4              MR. ROGERS:  Yes, sir.  Thank you.
 5              Judge, I -- I just wanted the Court to be aware that
 6    the -- the -- before the Court entertained these bond
 7    conditions, members of the church entered into the lease so she
 8    would have somewhere to go today.  I -- I'm -- I don't know
 9    their source of funds nor did I ask, nor have I spoke to those
10    individuals.  The Court is quite clear that she's to have no
11    contact with them, but I wanted to apprise the Court that they
12    were the ones that entered into the lease for the home so we'd
13    have an option for the Court.  I understand moving forward
14    they're not to in any way pay for the residence moving forward
15    and those funds need to come from my client independently or
16    from someone not associated with the court, but I wanted that
17    to be clear for the record.
18              THE COURT:  Not associated with the church.
19              MR. ROGERS:  Church, I'm sorry.
20              And one other question for clarification if I may.
21    If Ms. Jones were to disassociate herself with the church, does
22    the Court have an opinion as to whether or not it'd be
23    appropriate for her to reside at this location in order to
24    assist my client with her health concerns?
25              THE COURT:  You said if Ms. Jones disassociated
```

1    herself with the church?

2           MR. ROGERS:  Yes, sir.  And I -- you -- you

3    specifically stated she's to have no associated [sic] with Ms.

4    Jones, but that people that have no association with the church

5    could have contact with her.  Because of her -- her role with

6    respect to health care and my client, I don't know what her

7    decision would be or not.  I haven't spoken to her about this.

8    Just hypothetically, moving forward, if she were to entertain

9    that possibility, would that be permissible with the Court?

10          MS. RESNICK COHEN:  May the government speak to this

11   issue, Your Honor?

12          THE COURT:  You may.

13          MS. RESNICK COHEN:  The condition of bond that the

14   government -- that the Court is imposing is that there is no

15   contact with victims, witnesses or members of the organization.

16   Ms. Jones is a witness at a minimum.  So there is -- to abide

17   by the condition of bond, she cannot have any contact with Ms.

18   Jones, period.

19          And again, as the government argued before the -- the

20   magistrate judge and before this Court, the bond address is not

21   suitable because it is leased and paid for by members of the

22   organization.  So it -- it's a -- quite a straightforward

23   problem actually.  She has no place to live in the Eastern

24   District of Michigan.  The proposed place in Florida is wholly

25   inappropriate as it -- there's a lis pendens on it by the

1    government and it was the site of forced labor and is not in

2    this district, so it's not appropriate bond address and there

3    is no other appropriate bond address.

4            THE COURT:  Mr. Cynowa, do you wish to address it?

5            MR. CYNOWA:  Due to that, the Court would need to --

6    if the defendant were allowed to go to the Northville address,

7    the Court would need to add a condition explicitly allowing her

8    to reside there, more so than just the condition that she

9    reside at the bond address.

10           THE COURT:  Uh-huh.

11           MR. CYNOWA:  The Court would need to specifically say

12   that bond address.

13           THE COURT:  Well, counsel is indicating that

14   arrangements would have to be made and that they would be made

15   for this place to be paid for by some funds other than those of

16   the church.  Is that right, Counsel?

17           MR. ROGERS:  Yes, sir, that's what we would -- we

18   would make sure of as a result of what has now become a

19   condition of bond that was not in any way a condition.  We were

20   just trying to put together a home plan prior to all these

21   hearings.

22           THE COURT:  Well, I think the concern is that for her

23   well-being, to be continued to be funded by an organization

24   that's alleged basically to be a criminal organization is the

25   government's concern here, and I do think it's a legitimate

```
 1   concern.  At the same time, the -- the law should not be that

 2   if a person has no place to lay their head, then the

 3   alternative is that they be detained in prison.  I don't think

 4   that that's what the Bail Reform Act is for.

 5          And so what I would say is that for now, based on

 6   counsel's representations, because you're indicating that

 7   you'll find a way to enable her to live there without having it

 8   be associated with the church, if you can do that, then she can

 9   live there.  She can't be associated with the church anymore.

10          Are you following this, Ms. Brannon?

11          DEFENDANT BRANNON:  Yes, sir, Your Honor.

12          THE COURT:  Do you understand what you need to do?

13          DEFENDANT BRANNON:  Yes, sir, Your Honor.

14          THE COURT:  Do you understand your obligation not to

15   do anything whatsoever to contact any victim or witness in this

16   case, especially anyone associated with the church?

17          DEFENDANT BRANNON:  Yes, sir, Your Honor.

18          THE COURT:  So I assure you if you do, you'll be back

19   locked up immediately.

20          DEFENDANT BRANNON:  Yes, sir.

21          THE COURT:  All right.  Well, I'm satisfied that we

22   can go forward for now, but Mr. Cynowa, I'm depending on you to

23   keep track of this and to see what's going on with her living

24   circumstances.  And Ms. Brannon, this is going to be on you.  I

25   don't know if you have other family available that could help
```

1   you, but you're not going to be living in another church

2   mansion, you're not going to be living in a church expensive

3   apartment.  You're going to have to find a place that's

4   independent from that organization going forward.

5           All right.  Anything else we need to do?

6           MR. CYNOWA:  For the time being is...

7           THE COURT:  For the time being I will authorize her

8   to live in that Northville address, but I want to get a report

9   within the next 30 days from Pretrial indicating how that's

10  being paid for.

11          MR. CYNOWA:  Okay.  That will have to be ordered as

12  an additional bond condition at that point.

13          THE COURT:  We'll put that in there.

14          MS. RESNICK COHEN:  Your Honor?

15          THE COURT:  Yes.

16          MS. RESNICK COHEN:  In light of the pending

17  prosecution and the -- and the -- again, the presumption of the

18  serious nature of the allegations in this case, we are asking

19  that the update be sooner than 30 days because it's -- it --

20  it's a significant issue, Your Honor, and a significant concern

21  of the government and the victims and the witnesses in this

22  case that she has no association with any members of the

23  organization.  And essentially the Court is giving her 30 days

24  to have further association with the organization, and the

25  government is respectfully requesting that whatever association

1    the organization has with this house be limited to a period

2    substantially shorter than 30 days.

3           THE COURT:  How long do you suggest?  I mean we don't

4    know -- we don't -- we don't have information regarding this

5    right now, and so that's why I'm saying they can have 30 days

6    to figure out the information.

7           MS. RESNICK COHEN:  The government proffered that

8    information to -- to the magistrate judge, Your Honor.  That

9    home, as defense counsel has informed the Court as well, has

10   been leased by members of the organization.  So that lease will

11   have to be taken over by someone else, again not associated

12   with the organization, which is -- which is difficult for Ms.

13   Brannon to do for all of the reasons we have -- we have

14   discussed both in duty court and here today.  That will be a

15   difficult process for her.

16          And so again, having some kind of relationship for

17   30 days with this organization is -- is not a suitable bond

18   condition in the government's opinion, and we're respectively

19   requesting that an update be provided to the Court and that she

20   extricate herself from the lease and provide to the Court

21   assurances in a period shorter than 30 days that she has a bond

22   address that has absolutely nothing to do with any member of

23   the organization — any witness, current member, her son again

24   who is a member of the organization.  So we're simply

25   requesting that that update be in a much shorter time period

1    than 30 days.

2           MR. ROGERS:  Your Honor, I'm opposed to that.

3    Seems -- that seems in my opinion to be overly dramatic.  We

4    haven't had an opportunity to speak to the landlord.  There's

5    already a lease in place for a period of time.  She's ordered

6    to have no contact with the individuals that have the lease.

7    The Court has been very specific that she is not to rely on

8    funds from anyone associated with the church.

9           A 30-day time -- I do not know who paid the first

10   month's lease.  I know that she has the ability to leave

11   confinement today and go to that residence.  I think 30 days is

12   an appropriate amount of time to disassociate herself with

13   relying on any funds related to the church as you have clearly

14   ordered.  So 30 days is an appropriate amount of time to find a

15   third-party relative and/or friend not associated with the

16   church that will make the payments on the lease without having

17   to necessarily change the name on the lease itself,

18   understanding that she has -- she has to have no contact with

19   the people that previously entered into the lease.

20          We will certainly try to clean this up a little bit

21   by contacting the landlord to see if we can renegotiate that

22   lease and put someone else's name on the lease that's not

23   associated with the church, and 30 days seems to be reason -- a

24   reasonable period of time to try to accomplish that goal.

25          THE COURT:  All right.  Well, I'm going to stick with

1    what I said about the 30 days because Ms. Brannon is still not

2    permitted to have contact with people in the organization, and

3    I think it's reasonable to give her that amount of time to try

4    to get her affairs settled in a manner that's separate from the

5    church.  And if that has already been paid for, that she will

6    not have any contact with the church regarding that, and within

7    30 days either it will have to be continued under her own funds

8    or she'll have to find another place to live.

9            Go ahead.

10           MR. CYNOWA:  Just to clarify, within 30 days, is that

11   for the defense to get the information to Pretrial and for us

12   to independently investigate or is that for us to notify the

13   Court in 30 days?

14           THE COURT:  I'm not sure I understand the difference

15   between those two things.

16           MR. CYNOWA:  If it takes them 30 days to get us the

17   information, we may need longer than 30 days, like, if --

18   they'll have to get that to us well before the 30 days.

19           THE COURT:  I want to know within 30 days the

20   circumstances, however that happens, whether -- so you better

21   try to tell him before 30 days so that he can get that

22   information to me.

23           MR. ROGERS:  Understood.

24           THE COURT:  Okay.

25           MR. ROGERS:  Yes, sir.

```
1            THE COURT:  All right.  And I don't know who all
2    these people are here, if you're from this organization, but I
3    hope you've listened to what we've said as well, and there
4    better not be any attempts at intimidation or harassment of
5    anyone regarding this.  Is that clear to everyone here?  Nod
6    your heads and say yes.
7            AUDIENCE MEMBERS COLLECTIVELY:  Yes.
8            THE COURT:  It better be.
9            Is there anything else we need to do?
10           (Brief pause)
11           And so just for clarity, I mean this is going to be
12   in the written bond as well, but it would technically be a
13   $10,000 unsecured bond with all of the different conditions
14   that I've described, and we'll -- we will issue a written order
15   that will contain those bond conditions, all right?
16           MS. RESNICK COHEN:  Your Honor, just to clarify for
17   the record, the bond conditions include electronic monitoring,
18   correct?
19           THE COURT:  Yes.
20           MS. RESNICK COHEN:  Thank you.
21           THE COURT:  Electronic monitoring, location
22   monitoring.
23           Now, does the defendant need to sign this as well?
24   Okay.  Then I'll sign it.
25           MR. ROGERS:  Your Honor?
```

1          THE COURT:  All right.  If there's nothing further,

2    we can be adjourned.

3          Yes, sir.

4          MR. ROGERS:  I had one more question, and I'm sorry

5    if I missed this; I probably did.  If Ms. Jones disassociates

6    herself with the church, you still don't want her residing --

7          THE COURT:  Here's what I want to do on that.  You

8    have an experienced Pretrial Services officer here.  If there's

9    someone who wishes to work with or communicate with the

10   defendant who used to be or was at one point associated with

11   the church, you need to talk to the Pretrial Services officer

12   about that and we'll discuss whether or not that's consistent

13   with the bond or not.  For now, Ms. Jones, no.

14         MR. ROGERS:  Thank you.

15         THE COURT:  All right.  Thank you very much.

16         THE CLERK:  All rise.  Court's in recess.

17         (Court in recess at 2:35 p.m.)

18                        —  —  —

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T I O N

 2            I, Linda M. Cavanagh, Official Court Reporter of the

 3    United States District Court, Eastern District of Michigan,

 4    appointed pursuant to the provisions of Title 28, United States

 5    Code Section 753, do hereby certify that the foregoing pages 1

 6    through 57 comprise a full, true and correct transcript taken

 7    in the matter of United States of Michigan vs. D-2 Michelle

 8    Brannon, Case No. 25-20560, on Wednesday, October 1, 2025.

 9

10                         s/Linda M. Cavanagh
                           Linda M. Cavanagh, CRR, RMR, RDR, CRC
11                         Federal Official Court Reporter
                           United States District Court
12                         Eastern District of Michigan

13

14

15

16

17    Date: October 15, 2025
      Detroit, Michigan
18

19

20

21

22

23

24

25
```